Gerald KOBELL, Regional Director for Region Six of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MENARD FIBERGLASS PRODUCTS, INC., and/or Penn Lumber Company, Inc., and/or Barrett Land Company, Inc., Respondents.

Civ. A. No. 87–2742.

United States District Court, W.D. Pennsylvania.

Feb. 4, 1988.

Charles Saul, N.L.R.B., Region Six, Pittsburgh, Pa., for petitioner.

Robert F. Craven, Indianapolis, Ind., for respondents.

## MEMORANDUM OPINION

DIAMOND, District Judge.

This is an action on a petition brought by the Regional Director for Region Six of the National Labor Relations Board ("Board") pursuant to Section 10(j) of the National Labor Relations Act ("Act"), 29 U.S.C. § 160(j), seeking preliminary injunctive relief pending the final disposition of unfair labor practice charges currently before the Board. For the reasons set forth below, the petition will be granted in part and denied in part.

### *Background*

Section 10(j) of the Act provides:

#### Injunctions

(j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

On July 7, 1987, the United Steelworkers of America, AFL–CIO–CLC ("Union") filed charges with the Board alleging that the respondent companies have engaged in, and are engaging in unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act. Based upon these charges, the Regional Director for the Board's Sixth Region, through the Board's General Counsel, issued a complaint and amended complaint pursuant to Section 10(b) of the Act alleging that the respondent companies have engaged in, and are engaging in, unfair labor practices in violation of Section 8(a)(1) and (3) of the Act.

On December 22, 1987, the petitioner filed a petition with this court seeking a temporary restraining order and injunction against the respondent companies. After the respondent companies were given notice of the petition via the service of an order to show cause why a temporary injunction should not issue, this court issued a temporary restraining order enjoining the respondent companies from selling off or dissipating their assets without first putting aside $48,000 to cover any potential backpay liability relating to the proceedings before the Board. This temporary restraining order was extended by consent to January 15, 1988, when a hearing was held before this court on the issues raised by the complaint and petition. At the conclusion of this hearing, the temporary restraining order was extended by consent until February 3, 1988, to provide the parties with additional time to brief the issues and provide this court with a reasonable time for decision. On February 3, 1988, the temporary restraining order was again extended by oral consent of the parties until February 4, 1988.

In support of the issuance of preliminary injunctive relief, the Regional Director makes three claims. First, he asserts that the respondent companies Menard Fiberglass Products, Inc., Penn Lumber Company, Inc., and Barrett Land Company, Inc., are affiliated businesses holding themselves out as a single integrated business enterprise, and as such, a single employer within the meaning of the Act. The Regional Director next asserts that there is "reasonable cause" to believe that the respondents have been violating and continue to violate Section 8(a)(1) and (3) of the Act,

which prohibits an employer from interfering with or discriminating against employees in the exercise of their rights under the Act to form, join, or assist labor organizations. 29 U.S.C. § 158(a)(1) and (3). In light of this "reasonable cause," the Regional Director believes it is "just and proper" that this court grant injunctive relief in the form of an order (1) enjoining and restraining the respondents from selling, transferring or otherwise dissipating any of respondents' assets unless and until they first set aside and retain the sum of $48,-000 to protect any potential backpay awards created by their alleged unfair labor practices; (2) reinstating two of Penn Lumber Company's employees; and (3) that Penn Lumber Company and Menard Fiberglass Products establish preferential hiring lists regarding those Menard Fiberglass employees improperly discharged.

The respondent companies argue that they do not constitute a single integrated business enterprise and are not a single employer within the meaning of the Act. They further argue that the Regional Director lacks "reasonable cause" to believe that they are violating the Act. Finally, they argue that even if the court finds reasonable cause to believe that they are violating the Act, the type of relief sought by the Petitioner is not "just and proper" in the present case.

Based upon the complaint and petition, the testimony of Roger O. Menard, Sr., at the January 15, 1988, hearing before this court, and the exhibits of the parties including the transcript of proceedings before the

Board, the court makes the following findings of fact and conclusions of law.[1]

### Findings of Fact

There is, and petitioner has reasonable cause to believe that:

1. Respondent Menard Fiberglass Products ("Menard Fiberglass") is, and has been at all material times herein, a Pennsylvania corporation with its office and place of business in East Clearfield, Pennsylvania, where it is engaged in the manufacture and non-retail sale of pleasure boats. (Petitioner's Proposed Findings of Fact ("PPFF") No. 6(a)).[2] During the twelve-month period ending June 30, 1987, Menard Fiberglass has engaged in interstate commerce within the meaning of the Act. (Respondents' Proposed Findings of Fact ("RPFF") No. 6(c)).

2. Respondent Penn Lumber Company ("Penn Lumber") is, and has been at all material times herein, a Pennsylvania corporation with its office and place of business in East Clearfield, Pennsylvania, where it is engaged in the manufacture and non-retail sale of wooden pallets. (PPFF 6(b)). During the twelve-month period ending June 30, 1987, Penn Lumber has engaged in interstate commerce within the meaning of the Act. (RPFF 6(d)).

3. Respondent Barrett Land Company ("Barrett Land") is, and has been at all material times herein, a Pennsylvania corporation with its office and place of business located in East Clearfield, Pennsylvania, where it is engaged as a real estate holding company, owning the building and land in East Clearfield, Pennsylvania, where Menard Fiberglass and Penn Lum-

---

1. Respondents argue in their memorandum of points and authorities that the evidence presented to the court by the petitioner is insufficient to support the necessary findings of fact in this case because that evidence consists primarily of the transcript of proceedings before the ALJ and, insofar as the respondents have not yet begun to present their case before the ALJ, the court has only petitioner's view of the case. The respondents, however, had a full and fair opportunity to present evidence on their behalf at the preliminary injunction hearing held before this court and failed to take advantage of this opportunity. The only evidence they chose to present at this hearing was an ambiguous

1987 daily log of Menard Fiberglass boat orders. Although the respondents contest many of the factual assertions of the petitioner and attempt to outline how the testimony they will present at the administrative hearing will show the falsity of these factual allegations, they have not yet presented this evidence at the administrative hearing; nor have they provided the court with anything which could be considered proof, but only with statements made in their memorandum. Therefore, the evidence presented by the petitioner remains uncontested.

2. Respondents have accepted petitioner's proposed findings of fact Nos. 6(a) and (b).

ber operate their business. (R. 548 [3]).[4]

4. Roger O. Menard, Sr., is the President of all three respondent companies. ("Menard testimony").[5] As President, Mr. Menard handles all labor relations relating to the three respondent companies and supervises the employees of Menard Fiberglass and Penn Lumber. (*Id.*). Respondent Barrett Land apparently does not have any employees. (*Id.*).

5. In addition to handling all labor relations, Mr. Menard generally runs the operations of the respondent companies and decides which equipment both Menard Fiberglass and Penn Lumber should purchase. (*Id.*).

6. In addition to Mr. Menard as President, the three other officers of the respondent companies are identical. (*Id.*). These four individuals also own the three companies with each officer, including Mr. Menard, owning twenty-five percent of each company. (*Id.*).

7. The three respondent companies also have the same board of directors. (*Id.*).

8. The boards meet and discuss the business of all three companies at the same time in the same place. (*Id.*).

9. The minutes of the board meetings of all three respondent companies are consolidated and typed up on a single sheet of paper by a Menard Fiberglass employee so as to save money. (*Id.*).

10. No-interest loans have been made between the respondent companies. (*Id.*).

11. Menard Fiberglass and Penn Lumber rent their work space from Barrett Land. (*Id.*).

12. Rent is paid to Barrett Land by Menard Fiberglass and Penn Lumber pursuant to lease agreements which Mr. Menard signed on behalf of all three respondent companies. (*Id.*).

13. Menard Fiberglass and Penn Lumber share the same clerical offices, and the records of all three respondent companies are kept there. (*Id.*).

14. The computer owned by Menard Fiberglass prints out the payroll records of both Menard Fiberglass and Penn Lumber; however, Penn Lumber does not pay Menard Fiberglass for the use of the computer. (*Id.*).

15. Barrett Land uses the phone of Menard Fiberglass because Barrett Land does not do enough business to justify the cost of having its own phone. (*Id.*).

16. Similarly, there is only one utilities meter for all three companies since they could not afford to pay separate meter charges. (*Id.*).

17. The building in East Clearfield owned by Barrett Land in which Menard Fiberglass and Penn Lumber operate is divided into a lower and upper building. The upper building is shared by both Menard Fiberglass and Penn Lumber, with a wall separating the two operations. (*Id.*). Seven of the Menard Fiberglass employees worked in the lower building in what is referred to as the lay-up department. (R. 279). The lay-up department prepares the boats for final assembly which takes place in the upper building where the remaining Menard Fiberglass employees work. (R. 56, 62, 287–88).

18. The wall in the upper building which separates Menard Fiberglass from Penn Lumber contains four large doors. (Menard testimony). Occasionally, forklifts carrying pallets from the Penn Lumber side of the upper building are driven through these large doors and through the Menard Fiberglass side to the Menard Fiberglass loading dock. (*Id.*).

19. The janitor employed and paid by Menard Fiberglass works on both the pallet

---

3. Citations to R. ___ refer to the page number of the official transcript of proceedings before the N.L.R.B.

4. Although for convenience the wording of many of the findings of fact may track one of the petitioner's or respondent's proposed findings of fact, or petitioner's statement of facts in his memorandum in support of the petition, the finding itself is the result of the court's independent evaluation of the evidence.

5. "Menard testimony" refers to the testimony of Roger O. Menard, Sr., before this court at the January 15, 1988, temporary injunction hearing.

and boat side as per Mr. Menard's instructions. (*Id.*).

20. Occasionally, the same delivery truck is used by both Menard Fiberglass and Penn Lumber. (*Id.*).

21. Various employee transfers have occurred between Menard Fiberglass and Penn Lumber. (*Id.*; R. 63, 133–36, 244–46, 302, 592–94, 684–86, 751–52, 775–76, 814–15, 825–26, 830–32, 838–39).

22. Mr. Menard had called plant-wide meetings attended by both Menard Fiberglass and Penn Lumber employees at which he and his labor consultant, Ray Blankenship, attempted to dissuade the employees from joining the Union. (Menard testimony). This is significant not due to the subject matter of the meeting, but rather due to the fact that Mr. Menard conducted a meeting of both Menard Fiberglass and Penn Lumber employees at the same time in the same place.

23. In addition to Mr. Menard, supervision and management of both Menard Fiberglass and Penn Lumber are handled by Joseph Opaliski, the plant manager of both companies. (R. 136, 140–41, 684, 783, 841–42, 862–63).

24. On June 9, 1987, several Menard Fiberglass employees including Mary Beish began talking about walking out and/or contacting a union because Menard Fiberglass refused to give them a raise while rehiring final assembly supervisor Brenda Pellerite at a high rate of pay. Beish then attempted to contact a union. (R. 36–37, 484–85, 488–89, 493–94, 866–67). Later that day, however, Beish walked arm-in-arm with Mr. Menard who told her that he would take care of her if she "stuck with him." (R. 38–39, 490, 709). After that, Beish told the other employees that she no longer supported the movement because Mr. Menard had told her he would take care of her if she stuck with him. (R. 491, 710).

25. Beish also told Menard Fiberglass employee Jacqueline Laskowsky that Mr. Menard knew what was going on and that she, Beish, was calling the Union back to tell the Union not to bother with the employees. (R. 867–68).

26. Each of the employees who were subsequently laid off by *Menard Fiberglass* on June 19, 1987, were either actively involved in the discussions with Beish or had voiced their approval of a walkout and/or union in front of Beish. (R. 37, 235, 484, 488–89, 539, 578–79, 705–07).

27. On the following morning, June 10, 1987, Menard Fiberglass plant supervisor Andrea Shamp told the employees at a plant meeting that Beish had been promoted to lay-up supervisor and Pellerite to final assembly supervisor. Shamp also informed the employees that their work performance did not warrant raises. (R. 40–42, 492, 869).

28. After this meeting, Menard Fiberglass employee Mary Cartwright complained to Shamp about her criticism of the work performance. Shamp stated that the criticism was not meant for her or another Menard Fiberglass employee, Elaine Prisk. Cartwright responded that if the criticism was because of the Union, it was Beish who had called both the Union and a local newspaper about the proposed walk-out. (R. 42–44).

29. On June 11, employee Ruth Grattan contacted the Union and set up a meeting for Wednesday, June 16, 1987. (R. 579–80).

30. On June 16, 1987, the day before the Union meeting was to take place, Mr. Menard called a plant meeting for Menard Fiberglass employees at which he admonished the employees for their allegedly poor work performance; said he heard they were talking about a union and did not want to hear anymore about it or else no one would be working; threatened to close or sell the facility if he saw any sign of a union; and claimed he would personally sue any employees participating in a picket line and "bring them down" with him. (R. 44–46, 101–02, 241–42, 263–66, 495–97, 582, 710–11, 869–70).

31. The employees, however, continued to discuss the Union meeting and invited other employees to the Union meeting scheduled for the evening of June 17. On June 17, however, supervisor Beish told Laskowsky that there would be a "big lay-

off" on Friday [June 19] to "weed out the troublemakers." (R. 870–71).

32. On the evening of June 17, 1987, the Union met with nine employees and all nine signed union cards. (R. 178–188, GCX 14,[6] GCX 22(a)–(h)). Those nine were Madeline Cartwright, Elaine Prisk, Lorrie Prisk, Ruth Grattan, Willard Maines, Joe Verbitsky, Robert Harnish, and James Kukla of Menard Fiberglass and James Kolbe of Penn Lumber. (GCX 14, 16, 22(a)–(h)). Approximately five more Menard Fiberglass employees signed union cards on the following day, including Patrick Wisor, who was observed by supervisor Pellerite as he filled out the card. (R. 48, 86, 106–07, 315, 583–84, 686–87, 827, 871).

33. On Friday, June 19, eight Menard Fiberglass employees received a note with their paycheck informing them that they were laid off due to the lack of orders. None of these employees had received any advance notice. (R. 52–53, 242, 543). The eight laid off employees were Laskowsky, Cartwright, LeeAnn Jordan, Wisor, Elaine and Lorrie Prisk, Robert Harnish and James Kukla[7]. (R. 52–53, 242, 322–23, 475, 543, 704, 878).

34. All of these employees had previously signed union cards and were either the known principal Union organizers or closely associated with them. For example, Elaine and Lorrie Prisk, Grattan, Harnish and Jordan normally ate lunch together at work. (R. 54). Supervisor Shamp also knew that Elaine and Lorrie Prisk, Cartwright, Harnish and Laskowsky drove in a carpool together. (R. 54–55, 501–03). Harnish and Kukla worked closely together. (R. 704). In addition the Prisks, Grattan, Cartwright, Harnish and Kukla used their June 19 lunch break to meet concerning the Union. This lunch break meeting was observed by Mr. Menard's son, Roger Menard, Jr., who was seen talking to his father on several occasions after that meeting but before the employees were laid off. (R. 49–52).

35. At the 9:30 A.M. break on June 19, 1987, an employee told supervisor Beish that Harnish had asked her to sign a union card and that she refused. (R. 874–76). As soon as the break was over, Beish left the area and went to the upper building where higher supervisory personnel were stationed. (R. 874–77).

36. The evening after the layoffs on June 19, Jordan called supervisor Shamp and asked why the employees had been laid off. Shamp initially responded that it was due to economics, but later admitted that Mr. Menard had found out about the Union efforts of the employees and who had signed union cards. Shamp admitted that the people who were laid off were the ones Mr. Menard knew had signed union cards. (R. 243–44).

37. After the eight employees were laid off on June 19, Menard Fiberglass transferred at least two Penn Lumber employees to the Menard Fiberglass site to perform some of the work previously performed by the laid off employees. (R. 592–93, 775–76). Menard Fiberglass employees also performed overtime for about two weeks subsequent to the layoffs. (R. 592, RX 18). In addition, Menard Fiberglass hired approximately 15 employees subsequent to the layoffs to perform the work of the laid off employees. (R. 610, 632–34, 662–66, RX 18).

38. In late June or early July, Menard Fiberglass employee Marshall Maines asked Mr. Menard for a raise. Mr. Menard stated that he could not give Maines a raise because "the Union was getting in" and if he gave him a raise, he would have to give everyone else a raise. (R. 828).

39. On June 22, the Union filed petitions for representation elections with the Board for the employees of Menard Fiberglass and Penn Lumber. (GCX 4, 5). The respondent companies reacted with a vigorous anti-Union campaign, which included the showing of movies to the gathered em-

---

6. GCX ____ and RX ____ refer to the petitioner's and respondent's respective exhibits admitted into evidence at the N.L.R.B. hearing and the hearing before this court on January 15, 1988.

7. Mr. Menard had complimented Kukla on his work the day before, and told him he would receive a ten percent per hour raise. (R. 712).

ployees of Menard Fiberglass and Penn Lumber. These movies depicted violence at union-represented facilities. Mr. Menard and other representatives of respondents attributed the violence to the Union. (R. 596, 602–06, 769–70, GCX 31).

40. On June 23, 1987, Menard Fiberglass employee Ruth Grattan openly passed out Union literature outside the Menard Fiberglass and Penn Lumber facility. She passed this literature out to the other employees as well as Penn Lumber supervisor James McMasters. (R. 585). For the following few weeks, Menard Fiberglass supervisor Shamp and Menard Fiberglass/Penn Lumber general manager Opaliski watched her very closely and would stand and stare at her for ten or fifteen minutes at a time, about nine times a day. (R. 586).

41. On July 15, 1987, Grattan appeared at a representative hearing on behalf of the Union. She sat with Union representatives as well as Elaine Prisk and Jim Kolbe. (R. 586). Mr. Menard was also present at this meeting. After the hearing, Grattan's job was made more difficult because her supervisors required that she first see supervisor Shamp before she could receive anything from the wood shop. (R. 587–88, 623). Prior to the hearing, there was no such requirement. (*Id.*).

42. At the July 15, 1987, hearing, Mr. Menard stated that the eight employees laid off on June 19 were permanently laid off. (R. 595). In the past, layoffs had only been temporary—lasting from about two days to a month. (R. 283). Layoffs had also normally occurred in December and January, the slow season. (*Id.*).

43. On July 27, 1987, Grattan received a written warning for purported poor work performance. (R. 588–89, GCX 30). Grattan, however, never received the prior oral warnings which are referred to in the written warning and which normally are required before a written warning issues. (R. 590). The purported wrongdoings either had not occurred or, as known by management, were not the fault of Grattan. (R. 499–501, 591, 641–46). In addition, the written warning which was hand-ed Grattan, (GCX 30), did not contain the detailed information which now appears on the written warning contained in her personnel file. (R. 588–90).

44. On September 1, 1987, a combined meeting of the boat and pallet operations was held at which Mr. Menard told the employees that they could go back and tell the Union that the Union was no threat because he was selling the operations. He further told the employees that he did not know if the new company would leave the operation there or would move it—but if the new company remained there, he could "guarantee" that it would not hire all of them, especially those with a "blemished" record. (R. 79–80). Within a few days, a "for sale" sign appeared outside the Menard Fiberglass/Penn Lumber facility.

45. On or about September 1, 1987, Marshall Maines again asked Mr. Menard about receiving a raise. Mr. Menard responded that the companies were for sale and that no one was receiving a raise. Mr. Menard also stated that they could chalk up another one for the Union. (R. 829–30).

46. On or about November 2 and 6, 1987, two Penn Lumber employees, Albert Coulter and James Kolbe, were laid off. (R. 735–36, 841–42). Kolbe was the employee representative for the Union on the pallet side and had signed up the vast majority of the card signers from Penn Lumber. (R. 737–54, GCX 36–46). Coulter and he were about the only employees on the pallet side who wore pro-Union tee shirts and buttons at work during the summer of 1987. (R. 850–851).

47. At one of the anti-Union meetings held in August of 1987, Ray Blankenship, respondents' labor consultant, asked the employees if any of them had in their possession a Union constitution. (R. 848–49). Coulter raised his hand indicating that he had one. Mr. Blankenship then stated to the employees that they could see who was associated or paid by the Union. (*Id.*). After this meeting, Mr. Menard no longer spoke with Coulter upon seeing him. (R. 850).

48. Mr. Menard had previously been aware of Kolbe's Union activities because

Mr. Menard had questioned Kolbe regarding his involvement with the Union one day in mid-July when Kolbe went to pick up his paycheck. Kolbe admitted to Mr. Menard at that time that he was involved in the Union. (R. 769).

49. Kolbe was laid off by Penn Lumber on November 6, 1987. McMasters, Kolbe's supervisor, told Kolbe that he was told to lay him off by Joe Opaliski. (R. 782–83). McMasters also told Kolbe that the layoff was unnecessary, that McMasters needed him, and that he would give Kolbe a good recommendation. (R. 782–84). McMasters also told Kolbe that Coulter had been laid off because he was an agitator. (R. 804; 807). During the last two weeks of Kolbe's employment by Penn Lumber, two new employees were hired by Penn Lumber. (R. 780).

50. On November 6, 1987, Menard Fiberglass laid off most of its remaining employees including Anna Blake, David Bloom, James Caldwell, Brian Collins, Ruth Grattan, Denver Hampton, Karen Heichel, Julie Hepfer, Patricia Jozefik, Timothy Knepp, Michael Lyon, Eric Mahlon, Andrew Maines, Billie Mattie, Paul Pedmo, Catherine Schoening, Joseph Verbitsky, William White, and Virginia Yost. (RX 18, R. 630). Production on boats continued with supervisory personnel and several employees.

51. On December 16, 1987, Roger Menard, Sr., testified at the N.L.R.B. hearing before the Administrative Law Judge that all three respondent companies were up for sale; and that the sale itself was close to being consummated. (R. 548–61). Mr. Menard also indicated that creditors were threatening to force respondents into bankruptcy. (R. 565–66). Mr. Menard further testified that the prospective purchaser did not wish to retain any of the current employees or Mr. Menard, and was considering shutting down all operations at the East Clearfield facility and transferring the assets elsewhere. (R. 557–62).

52. On December 17, Ray Blankenship stated on the record at the administrative hearing that the respondent companies were "emphatically" opposed to posting a bond in the amount of $35,000, or setting aside a like amount from the proceeds of the sale of the respondent companies to cover the approximate amount of backpay which was then estimated to be due the alleged discriminatees up to that date in the event the allegations in the complaint were sustained by the Administrative Law Judge and reviewing bodies. (R. 702).

### Discussion

■ At the outset, it is important to understand that a district court has a very limited role in this area of the law. A district court is not to act "as if it had general jurisdiction over the nation's labor laws." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1083 (3d Cir.1984). The court "may not decide whether or not to issue relief based on its own belief as to whether an unfair labor practice has been committed." *Id.* Rather, by fashioning section 10(j), "Congress sought to ensure that the board would be able to exercise effectively its ultimate remedial power. Therefore, section 10(j) was included to provide interim relief in a situation in which the Board and courts believe that it is necessary to preserve the effective exercise of such remedial power." *Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir.1986) (citations omitted). With this in mind, the court will now address the three issues in this case: (1) whether the respondent companies constitute a single employer within the meaning of the Act; (2) whether the Regional Director has "reasonable cause" to believe that the respondents are violating the Act; and if so, (3) whether the relief sought by the Regional Director in the present case is "just and proper." The court will address each issue in turn.

### I. *Single Employer*

Before determining whether the above findings of fact provide the Regional Director with "reasonable cause" to believe that the Act has been violated, and whether the type of relief sought is "just and proper," the court must determine whether the

respondent companies are a single employer within the meaning of the Act.

■■■ There are four recognized criteria for determining the existence of an integrated enterprise or joint employer for purposes of the Act:

(1) interrelation of operations,

(2) common management,

(3) centralized control of labor relations, and

(4) common ownership or financial control.

*N.L.R.B. v. Triumph Curing Ctr.*, 571 F.2d 462 (9th Cir.1978); *see Radio Union v. Broadcast Service*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965). Although no single criterion is controlling, the first three, which evidence operational integration, are more critical than the fourth. *Triumph*, 571 F.2d at 468. As more clearly outlined below, the court concludes that the testimony of Roger O. Menard, Sr., at the preliminary injunction hearing before this court amply supports a finding that the three respondent companies are a single employer for purposes of the Act.

The evidence shows that the respondent companies are significantly interrelated. They share office space, employees, and equipment in a manner inconsistent with a finding that they are separate entities. (FF 8–9, 13–21).[8]

All three separate respondent companies are also under common management with Roger O. Menard, Sr. running the operations as President. In addition to Mr. Menard, the respondent companies have the same vice president, treasurer, and secretary as well as a common Board of Directors. (FF 4–7).

Moreover, control of labor relations is centralized in one person, Mr. Menard. (FF 4). The fact that Barrett Land has no employees does not weigh against a finding that Barrett Land, along with Menard Fiberglass and Penn Lumber are a single employer. In fact, it actually supports such a finding because it appears to the court that Barrett Land is able to exist

without any employees due, at least in part, to its ability to use the employees of the other two respondent companies. For example, Mr. Menard testified that the minutes of the Board of Directors of Barrett Land, Penn Lumber, and Menard Fiberglass meetings are typed upon a single sheet of paper by a Menard Fiberglass employee. (FF 9).

The fourth factor listed above also supports the conclusion that the respondents are a single employer since all three companies are owned by the same four individuals. (FF 6). Accordingly, the court concludes that under the recognized criteria, the three respondent companies are a single employer within the meaning of the Act. The court also concludes that as a single employer, the respondents have affected commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C. § 152(6) and (7). Having so concluded, the court will now address the "reasonable cause" and "just and proper" issues.

## II. *Reasonable Cause*

■■■ The United States Court of Appeals for the Third Circuit has set forth a two-prong standard to be used by a district court in determining whether to grant a Section 10(j) injunction. That standard requires:

[F]irst, that the district court decide whether there is "reasonable cause" to grant the injunction. This prong of the test is satisfied when, viewing the facts most favorable to the Board, there is sufficient evidence to support the legal theory of violation presented by the Regional Director, and when that theory is substantial and not frivolous. Second, having found "reasonable cause," the district court must find that the issuance of an injunction is "just and proper," i.e., that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board.

---

**8.** Ff ___ refers to the court's findings of fact     listed above.

*Lenape,* 781 F.2d at 1003. In addition, the Court of Appeals instructs that this standard involves a "low threshold of proof," *Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902, 905 (3d Cir.1981), is "relatively insubstantial," *Kobell,* 731 F.2d at 1084, and requires less evidence "than that necessary to prove a violation." *Id.*

In the present case, the Regional Director claims that the respondents have violated and continue to violate section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3). That section makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed by the Act to form, join, or assist a labor organization; or to discourage membership in any labor organization by discrimination in regard to hiring or tenure of employment or by imposing any term or condition of employment. *Id.*

■ The Regional Director's theory of violation is that the respondents, through Roger O. Menard, Sr., and others, discharged the eight Menard Fiberglass employees on June 19, 1987, the two Penn Lumber employees on November 2 and 6, 1987, and the remaining Menard Fiberglass employees on November 6, 1987, due to their Union activities or sympathies. The Regional Director also claims that the respondents imposed more onerous working conditions on Ruth Grattan due to her open support of the Union. Additionally, the Regional Director claims that the respondents, through Mr. Menard, interfered with the rights of the above-named employees to form and join the Union by threatening that no one would be working if they joined the Union, that he would close or sell the facilities if he saw any sign of the Union, that he would personally sue any employees who participated in a picket line, and that raises would be withheld because of the Union talk.

This theory is clearly substantial and non-frivolous. The question remains, however, whether there is sufficient evidence to support this theory.

Regarding the discharge of Menard Fiberglass employees Cartwright, Harnish, Jordan, Kukla, Laskowsky, Elaine and Lorrie Prisk, and Wisor on June 19, 1987, the evidence, when viewed in the light most favorable to the Regional Director, shows that they were all principles in the Union organization movement or involved in the Union movement from the inception, (FF 24–26, 32), that this was known by respondents, (FF 26, 28, 34–36), that they were discharged for this involvement two days after the first Union organizational meeting was held, (FF 31–33, 36), and that new employees were hired subsequent to their layoff on June 19 to do the work they had previously performed. (FF 37).

Regarding the November 2 and 6, 1987, layoffs of Penn Lumber employees Albert Coulter and James Kolbe, the evidence, again viewed in the light most favorable to the Regional Director, shows that they were the main Union supporters on the Penn Lumber side, (FF 46–48), that this was known to respondents, (*id.*), and that they were laid off due to their support of the Union. (FF 49).

Regarding the imposition of more onerous working conditions on Menard Fiberglass employee Ruth Grattan, the evidence, again viewed in the proper light, shows that she was one of the original Union organizers. (FF 29, 32). It also shows that she became the principal Union organizer on the boat side after the June 19, 1987, layoffs, (FF 40–41), that this was known by the respondents, (*id.*), and that after her appearance at the Union representation meeting on July 15, 1987, her job was made more difficult by the addition of a requirement that she get prior approval before she was permitted to receive anything from the wood shop. (FF 41).

Regarding the threatening statements by Mr. Menard, various employees have testified at the hearing before the ALJ that Mr. Menard has made these alleged threats. (FF 30).

The November 6, 1987, layoffs of Menard Fiberglass employees Anna Blake, David Bloom, James Caldwell, Brian Collins, Ruth Grattan, Denver Hampton, Karen Heichel, Julie Hepfer, Patricia Jozefik, Timothy Knepp, Michael Lyon, Eric Mah-

lon, Andrew Maines, Billie Mattie, Paul Pedmo, Catherine Schoening, Joseph Verbitsky, William White, and Virginia Yost, however, present a more difficult question due to the seasonal nature of the boat business, (FF 42), and the fact that, unlike the earlier improper discharges, there is no evidence that additional employees were hired by Menard Fiberglass subsequent to the November 6 layoffs to do the work previously performed by the above employees. However, because Menard Fiberglass did not layoff all employees on November 6, 1987, but remained in operation with some employees (FF 50), the court finds that, in light of the previous improper layoffs or discharges, it is reasonable to infer, and the Regional Director has reasonable cause to believe, that these specific employees were selected to be laid off for improper reasons—at least as to those employees shown to be Union organizers or sympathizers.[9]

In summary, based upon the evidence discussed above, as well as the court's findings of fact not specifically referred to above, the court finds that, with the exception of some employees laid off on November 6, 1987, by Menard Fiberglass, there is sufficient evidence to support the legal theory of the Regional Director. Therefore, the court concludes that there is reasonable cause to grant the injunction.

### III. *Just and Proper Relief*

In the present case, the petitioner seeks three forms of relief. First, the petitioner seeks the temporary sequestration of $48,000 of respondents' assets. Second, the petitioner seeks the reinstatement of Albert Coulter and James Kolbe, the two Penn Lumber employees laid off on November 2 and 6, 1987. Finally, the petitioner seeks the establishment of preferential hiring lists by both Penn Lumber and Menard Fiberglass regarding the Menard Fiberglass employees improperly laid off on

June 19, and November 6, 1987. Having found that there is reasonable cause to believe that the Act has been violated, the court must now determine whether the above relief is "just and proper."

As outlined earlier, the determination that the relief is "just and proper" requires a finding "that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board." *Lenape,* 781 F.2d at 1003 (citations omitted). The relief to be granted, however, "is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." *Kobell,* 731 F.2d at 1091. The Third Circuit has also instructed that in reaching its conclusion regarding the propriety of section 10(j) interim relief, "the district court should discuss and determine whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers." *Id.* at 1091–92. The court will now address the propriety of each form of relief in light of these principles.

### A. *Sequestration of Assets*

Section 10(c) of the Act permits the Board to order an employer to pay backpay to improperly discharged employees. 29 U.S.C. § 160(c). Because there is "reasonable cause" to believe that various Penn Lumber and Menard Fiberglass employees were improperly discharged, the Regional Director believes a backpay order may issue in this case. The Regional Director, however, seeks the temporary sequestration of $48,000 of respondents' assets because he believes that the respondents may defeat such a backpay order by dissipating their assets before the Board either can finally compute the amount of backpay liability or obtain enforcement of its remedial

---

**9.** These employees are Anna Blake, Jim Caldwell, Brian Collins, Ruth Grattan, Eric Mahlon, Joe Verbitsky, and Virginia Yost (*see* GCX 14–17, 20, 22(a) and (c), R. 29, 32, 40–41). The petitioner has not referred to, and the court is unable to find, any evidence regarding the Un-

ion activities of the remaining twelve employees. Therefore, the court is unable to conclude that the Regional Director has reasonable cause to believe that these twelve employees were improperly discharged by Menard Fiberglass.

order under section 10(e) of the Act, 29 U.S.C. § 160(e). Because the court agrees with the Regional Director, the court will grant this interim relief.

The testimony of Roger O. Menard, Sr., before the ALJ and this court indicates that he and the other owners of the respondents are in the process of selling off some, if not all, of the assets of the respondent companies without providing for satisfaction of any future backpay liability. (FF 51–52). Thus, the court finds that the failure of this court to order the temporary sequestration of $48,000 in assets is likely to render any ultimate backpay award issued by the Board meaningless. *See, e.g., Pascarell v. Alpine Fashions, Inc.,* 126 LRRM 2242 (D.N.J.1987).

In addition, the court finds that the specific sequestration order set forth in the Order Granting Temporary Injunction is narrowly tailored to effectuate the ability of the Board to order backpay without being unduly burdensome to respondents. Specifically, it does not prevent the respondents from selling any of their assets in arms' length transactions for a fair and present consideration. Nor does it prevent the respondents from incurring and paying legitimate, current business expenses. Rather, it merely precludes the respondents from dispersing or dissipating their assets or the proceeds of the sale thereof without first preserving sufficient funds to satisfy their potential statutory backpay obligation. Moreover, the temporary injunction respects the claims of secured and judgment creditors since the Board seeks only the status of an unsecured creditor and its pro rata share of assets available after discharge of secured obligations.

Accordingly, the court concludes that it is "just and proper" that pending final disposition of the matters before the Board, respondents, their officers, supervisors, representatives, agents, servants, and all persons acting in concert or participation with them be enjoined and restrained from dissipating or transferring any assets or funds they may have, as set forth in the Order Granting Temporary Injunction, unless and until they discharge any backpay liability caused by respondents' unfair labor practices, or, in the alternative, post a surety bond as described in the Order Granting Temporary Injunction.

### B. *Reinstatement of Penn Lumber Employees*

In light of the "reasonable cause" to believe that Penn Lumber employees Albert Coulter and James Kolbe were improperly laid off by Penn Lumber, the Regional Director seeks an order that they be offered reinstatement to their former or equivalent positions of employment, without any loss of rights or privileges.

In the *Wellington Hall* case, 651 F.2d 902, the Third Circuit indicated that it was "just and proper" to grant temporary injunctive relief under section 10(j) in the form of a reinstatement order notwithstanding the fact that the employees ultimately could be reinstated with backpay by the Board. The Court explained that this is because the Regional Director acts not on behalf of the individual employees, but on behalf of the public interest:

> That interest is in the integrity of the collective bargaining process. If union supporters are excluded from the bargaining process pending resolution of unfair labor practice charges, the position of the designated bargaining representative will in all likelihood be substantially undermined. All members of the bargaining unit may be effected by such an erosion of union support. Furthermore, the discharge of "active and open union supporters ... risk[s] a serious adverse impact on employee interest in unionization."

*Id.* at 907 (citations omitted).

In the present case, James Kolbe and Albert Coulter are clearly active and open union supporters. (FF 32, 46–49). In fact, Kolbe was the employee representative for the Union on the pallet side. (FF 46). The court finds that the failure of this court to reinstate these two active and open Union supporters would risk serious adverse impact on the Penn Lumber employees' interest in unionization, rendering their ultimate reinstatement by the Board ineffectual. In

contrast, an order that reinstatement be offered will reaffirm to all employees on the pallet side that their statutory right to support the Union will be protected from employer retaliation.

The respondents argue that the present case is on all fours with *Kobell v. Suburban Lines* in which the Third Circuit approved of a narrow exception to "the presumption created by *Wellington Nursing Home* that ultimate reinstatement is unlikely adequately to vindicate the remedial powers of the Board." 731 F.2d at 1094. The district court found that, given the size and intimacy of the Union, the court had no reason to think that the Union could not swiftly and effectively reconstruct itself once the Board renders its final decision. Under those circumstances, the court concluded that reinstatement was not necessary. *Id.* at 1093.

A review of the district court decision in that case, however, reveals that the Union was small (about 38 members) and had been the exclusive collective bargaining representative of the relevant employees for at least fourteen years. *Kobell v. Suburban Lines*, 113 LRRM 2990, 2991 (W.D. Pa.1983), [Available on WESTLAW, 1983 WL 2069], *aff'd*, *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076 (3d Cir.1984). In the present case, however, the court is unable to make a similar finding based upon the record evidence presented. Accordingly, we rely on the presumption set forth in *Wellington Hall*; and, for the reasons stated above, conclude that it is in the public interest to order the offers of reinstatement as set forth in the Order Granting Temporary Injunction.

### C. *Preferential Hiring Lists*

Inasmuch as Menard Fiberglass is no longer operating at this time, no reinstatement order is sought by the Regional Director for the Menard Fiberglass employees laid off on June 19, 1987,[10] and November 6, 1987.[11] However, because the respondents are a single employer under the Act, and there have been past transfers of employees from one operation to the other, the Regional Director argues that it is "just and proper" that the laid off Menard Fiberglass employees be placed on a preferential hiring list for any vacant positions that should occur at Penn Lumber. Additionally, the Regional Director argues that it is "just and proper" that these same employees be placed on a preferential hiring list for any position which may become available at Menard Fiberglass if Menard Fiberglass should resume operations. The Regional Director requests that hiring from these lists be done on a non-discriminatory basis, governed by consideration of the individual's job qualifications. In addition, because the individuals laid off in June "were the ones who were the subjects of the brunt of Respondents' unfair labor practices," the Regional Director believes that it is reasonable for those employees to be placed on a first preferential hiring list, with the employees discharged in November placed on a second list.

The court finds that the justification for ordering interim reinstatement is equally applicable to the question of whether these employees should be placed on a preferred hiring list. Thus, if these employees would qualify for reinstatement under the principles set forth in *Wellington Hall*, the court believes that their placement on a preferential hiring list would be "just and proper."

Regarding the eight employees laid off on June 19, the court finds that they were all active and open Union members, either principals in the Union organization movement or involved in the movement from its inception. (FF 24–26, 28, 31–36). Similarly, regarding the seven employees laid off

---

**10.** Those eight employees are Madeline Cartwright, Robert Harnish, LeeAnn Jordan, James Kukla, Jacqueline Laskowsky, Elaine Prisk, Lorrie Prisk, and Patrick Wisor.

**11.** Insofar as the court previously has held that there is no reasonable cause to believe that all Menard Fiberglass employees laid off on November 6, 1987, were improperly discharged, the list of individuals subject to relief has been effectively reduced to Anna Blake, James Caldwell, Brian Collins, Ruth Grattan, Eric Mahlon, Joseph Verbitsky, and Virginia Yost. *See* note 9, *supra.*

on November 6, the court also finds that they were active and open Union members as evidenced by their participation in Union activity since its inception at Menard Fiberglass, or their attendance and participation at the various Union organizational meetings. (FF 29, 32, 34, 40–41; GCX 14–17, 20, 22(a) and (c)).

For the reasons stated above in support of the reinstatement of Penn Lumber employees Kolbe and Coulter, the court finds that the placement of these employees on preferential hiring lists as set forth in the Order Granting Temporary Injunction is in the public interest, so as to effectuate the policies of the Act and, therefore, "just and proper" under the circumstances. *See Boire v. Tiffany Tile Corp.*, 47 LC ¶ 18, 235 (M.D.Fla.1963) (district court order under § 10(j) that improperly discharged employees be placed on preferred list for employment). In addition, in light of this court's finding that the three respondents are a single employer for purposes of the Act, and that employee transfers between the pallet and boat operations have occurred in the past, the court concludes that it is "just and proper" for both Penn Lumber and Menard Fiberglass to be subject to the preferential hiring lists so long as hiring is to be governed by each individual employee's job qualifications.

Finally, the court will impose a time limitation on the duration of the temporary injunction which will issue in this case. The Third Circuit has held that all Section 10(j) injunctions should include an explicit time limitation, not longer than six months, on the restraint they impose. *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138 (3d Cir.1975). Accordingly, the injunction in the present case will remain in effect until the final disposition of the matters involved herein now pending before the Board, or six (6) months from the date of the issuance of the injunction, whichever period is shorter.

An appropriate order will follow.

### ORDER GRANTING TEMPORARY INJUNCTION

This cause came to be heard upon the verified complaint and petition of Gerald Kobell, Regional Director for Region Six of the National Labor Relations Board, herein called the Board, for and on behalf of said Board, for a temporary injunction pursuant to Section 10(j) of the National Labor Relations Act, as amended, herein called the Act, pending the final disposition of the matters involved pending before the Board, and upon the issuance of an Order to Show Cause why injunctive relief should not be granted as prayed in said complaint and petition.

The court, upon consideration of the petition, answer, briefs and arguments of counsel, and the entire record in the case has made and filed its Findings of Fact and Conclusions of Law, finding and concluding that there was reasonable cause to believe that respondents Menard Fiberglass Products, Inc., Penn Lumber Company, Inc. and Barrett Land Company, Inc., have engaged in and are engaging in acts and conduct in violation of Section 8(a)(1) and (3) of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act, and that such acts and conduct will be likely to be repeated or continued unless enjoined. The court has also found and concluded that in order to prevent irreparable harm to the public interest and policies of the Act and to preserve issues for the orderly determination as provided for in the Act, it is appropriate, just and proper to enjoin such acts and conduct.

NOW, THEREFORE, UPON THE ENTIRE RECORD, IT IS ORDERED, ADJUDGED AND DECREED that pending the final disposition of the matters involved herein now pending before the National Labor Relations Board, or for a six (6) month period from the date of issuance of the injunction, whichever is shorter, respondents, their officers, representatives, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, be, and the same hereby are, enjoined and restrained from:

1. In any manner or by any means selling, transferring, dissipating, distributing or otherwise disposing of any of respondents' assets in the disposition of their

business, including but not limited to equipment used to carry out any or all of the respondents' businesses, finished products, accounts receivable, and monies deposited in any or all of respondents' bank accounts, except as they may be required to do so pursuant to any lien of record recorded prior to the filing of the charges involved herein, unless and until they first set aside and retain the sum of $48,000 to protect the claims created by their alleged unfair labor practices as set forth in the complaint and notice of hearing, dated August 21, 1987, as amended. Respondents may sell or transfer assets for a full, fair and present consideration actually paid to respondents provided that the receipts from any such sale or transfer shall be held intact and not disbursed except to the extent that it is necessary to do so to pay bona fide current business operating expenses such as rent, utilities, maintenance and insurance expenses, or to satisfy bona fide liens of record or judgments of record of persons or entities other than any officer, director, or shareholder of respondent Menard Fiberglass Products, Inc., respondent Penn Lumber Company, Inc. and respondent Barrett Land Company, Inc. which were recorded prior to the filing of the charges herein; provided further, that respondents shall keep, and make available to the Board upon request for inspection and copying, written records of each and every transaction involving expenditures or receipts by respondents in excess of $50.

2. Unless and until the sum of $48,000 is set aside and retained, in any manner or by any means entering into any arrangement or agreement providing for or which would result in, a lien on any of the respondents' current assets or pledging any of their current assets as security or encumbering any of their current assets.

3. Unless and until the sum of $48,000 is set aside and retained, distributing any of the respondents' assets, or the proceeds from the sale or divestment thereof, to the shareholders, officers or directors of respondent Menard Fiberglass Products, Inc., respondent Penn Lumber Company, Inc. and/or respondent Barrett Land Company, Inc., or to any other corporation or enter-

prise controlled by them or by their shareholders, officers or agents, for the repayment of loans to any of respondents, from its officers, shareholders, or directors, or for the payment of unreasonable salaries to any of the respondents' officers, shareholders or directors.

4. Respondents may establish from the proceeds of any sale or liquidation of its physical assets, or from other assets if any, an escrow fund in the amount of $48,000 in an interest-bearing account. Such escrow shall be subject to the conditions expressed in sub-paragraphs (1) through (3) above, and verification of the existence of such an escrow shall be presented to the Board's Regional Director for Region 6 not later than 15 calendar days after the approval of the temporary restraining order. Respondents' provision of equivalent security, in the form of a surety bond in the amount of $48,000 shall also be considered satisfactory compliance with the term of the temporary restraining order.

5. Interrogating employees concerning their union activities.

6. Threatening employees with plant closure if they select the Union to represent them.

7. Informing employees they would not receive raises because of their activities on behalf of the Union.

8. Threatening to sell the company because of the employees' activities on behalf of the Union.

9. Threatening employees with loss of employment because of their activities on behalf of the Union.

10. Creating an impression among employees that their union activities were under surveillance.

11. Threatening to move the plant if employees choose to be represented by a union.

12. Threatening employees with discharge if they choose to be represented by a union.

13. Threatening employees with lawsuits if they choose to be represented by a

union or engage in other protected concerted activities.

14. Laying off and/or discharging employees because of their membership in and activities on behalf of United Steelworkers of America, AFL–CIO–CLC.

15. Imposing more onerous working conditions on employees because of their membership in and activities on behalf of United Steelworkers of America, AFL–CIO–CLC.

16. Issuing written reprimands to its employees because of their membership in and activities on behalf of United Steelworkers of America, AFL–CIO–CLC.

17. In any other manner, or by any other means, discriminating against its employees in regard to their hire or tenure of employment, or any terms and conditions of employment in order to discourage membership in United Steelworkers of America, AFL–CIO–CLC, or any other labor organization.

18. In any other manner, or by any other means, interfering with, restraining or coercing its employees in the exercise of their rights to self organize, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activity for the purpose of collective bargaining or other mutual aid or protection, and to refrain from any and all such activities, as guaranteed under Section 7 of the National Labor Relations Act.

IT IS FURTHER ORDERED that:

1. Respondent Penn Lumber Company Inc. shall reinstate its employees Albert Coulter and James Kolbe to their former or substantially equivalent positions of employment, without any loss of any rights or privileges.

2. Respondent Penn Lumber Company, Inc. shall establish a first preferential hiring list of the below-named employees, and hire these employees from this list on a non-discriminatory basis, governed by consideration of their job qualifications, before hiring any employees named below in paragraph 3 in the second preferential hiring list, or any new employees to perform that work. The employees on the first preferential hiring list are:

Madeline Cartwright
Robert Harnish
LeeAnn Jordan
James Kukla
Jacqueline Laskowsky
Elaine Prisk
Lorrie Prisk
Patrick Wisor

3. Respondent Penn Lumber Company, Inc. shall establish a second preferential hiring list of the below-named employees, and hire these employees from this list on a non-discriminatory basis, governed by consideration of their job qualifications, before hiring any new employees to perform that work. The employees on the second preferential hiring list are:

Anna Blake
James Caldwell
Brian Collins
Ruth Grattan
Eric Mahlon
Joseph Verbitsky
Virginia Yost

4. Respondent Menard Fiberglass Products, Inc. shall establish a first preferential recall list of the below-named employees, and recall these employees on a non-discriminatory basis, governed by consideration of their job qualifications, before hiring any employees named below in paragraph 5 on the second preferential hiring list, or any new employees to perform that work, should respondent Menard Fiberglass Products, Inc. resume operations. The employees on the first preferential recall list are:

Madeline Cartwright
Robert Harnish
LeeAnn Jordan
James Kukla
Jacqueline Laskowsky
Elaine Prisk
Lorrie Prisk
Patrick Wisor

5. Respondent Menard Fiberglass Products, Inc. shall establish a second preferential recall list of the below-named em-

ployees, and recall these employees on a non-discriminatory basis, governed by consideration of their job qualifications, before hiring any new employees to perform that work, should respondent Menard Fiberglass Products, Inc. resume operations. The employees on the second preferential recall list are:

Anna Blake

James Caldwell

Brian Collins

Ruth Grattan

Eric Mahlon

Joseph Verbitsky

Virginia Yost

6. Respondent Menard Fiberglass Products, Inc. shall, either in person or by registered mail, promptly notify petitioner if respondent Menard Fiberglass Products, Inc. resumes operations in any manner or form, telling petitioner the date, location, mailing address and business telephone number of said business.