781 F.2d 999
 121 L.R.R.M. (BNA) 2617, 54 USLW 2431,
104 Lab.Cas. P 11,816
 Arthur EISENBERG, Regional Director of the Twenty-second
Region of the National Labor Relations Board, for
and on Behalf of the NATIONAL LABOR
RELATIONS BOARD, Appellants,
v.
LENAPE PRODUCTS, INC., Appellee.
 No. 85-5414.
 United States Court of Appeals, Third Circuit.
 Argued Oct. 28, 1985.
Decided Jan. 22, 1986.
 
 1
 John Hornbeck, (Argued), N.L.R.B., Washington, D.C., for appellants.
 
 
 2
 Arnold M. Mellk, (Argued), Ezra D. Rosenberg, Katzenback, Gildea & Rudner, Lawrenceville, N.J., for appellee.
 
 
 3
 Before GARTH, and BECKER, Circuit Judges, and HUYETT, District judge.*
 
 OPINION OF THE COURT
 
 4
 HUYETT, District Judge.
 
 
 5
 Petitioner Arthur Eisenberg, the Regional Director of the Twenty-second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, filed with the court below a petition pursuant to section 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 160(j),[1] for a temporary injunction, requiring respondent Lenape Products, Inc. to offer certain discharged employees interim reinstatement to their former positions. Concluding that imposition of an injunction was not just and proper under all of the circumstances, the district court denied the petition for injunctive relief. Because we find that the district court did not abuse its discretion in denying the petition for an injunction, we will affirm.
 
 I.
 
 6
 In his petition for injunctive relief, petitioner Eisenberg alleged that respondent Lenape engaged in "unfair labor practices" within the meaning of section 8(a)(1) of the NLRA, 29 U.S.C. Sec. 158(a)(1), by discharging employees who had "ceased work concertedly and engaged in a lawful strike." Pursuant to section 10(j) of the NLRA, 29 U.S.C. Sec. 160(j), the National Labor Relations Board (NLRB or Board), through petitioner Eisenberg, sought injunctive relief pending final disposition of the case, and, in particular, sought an order requiring respondent to reinstate those employees who had been discharged pending a final adjudication by the board.
 
 
 7
 Respondent Lenape is engaged in the manufacture of ceramic products at four New Jersey locations, each of which constitutes a "division." This action arises from a series of events involving the day-shift employees at Division 3. At the relevant time, there were nine people employed on the day shift, and these individuals were not members of any union and therefore were not represented by a collective bargaining agent. Only the employees at Division 4 had union representation although there is some mention in the record that the employees in Division 1 are now unionized.
 
 
 8
 The events precipitating this action began on December 27, 1984. On that day, at approximately 10:15 a.m., Charles Bernhardt, Sr., an employee at Lenape and the unofficial spokesman for the day shift employees, telephoned Peter Hexter, the Chief Executive Officer for Lenape and told him that the employees were concerned about the working conditions at Division 3. He then demanded to meet with Hexter at 11:00 a.m. "or else we are going to walk out." Hexter responded that he was not available at 11:00 a.m. but that he could be there at noon. Hexter also suggested that it might be more convenient to meet after the holidays. Bernhardt rejected this suggestion claiming that Hexter was merely trying to give the employees the runaround.
 
 
 9
 Hexter arrived at the Division 3 plant at approximately 12:05 p.m. to find that the employees had left their jobs. The following day, the employees returned and were told that they were considered to have abandoned their positions and would be replaced by new employees.
 
 
 10
 Prior to the December 27th employee walk-out, dissatisfaction among the employees over working conditions was mounting. Petitioner contends that the dissatisfaction was caused, in large part, by the hiring of Herman Glinecke as "production control manager" for all four divisions. Glinecke allegedly instituted certain changes including (1) new processes for treating ashtrays which caused employees to develop skin rashes and irritations; (2) changes in hours of work without notice; (3) institution of time studies; and (4) disregard for job classifications. Furthermore, the employees were becoming increasingly concerned about health and safety problems within the Division 3 facility including an increasing rat population and exposed electrical wires. Glinecke was allegedly advised of these concerns but never took any remedial action. Moreover, Bernhardt asked Glinecke to contact Hexter to arrange a meeting for the employees with Hexter to discuss employee concerns. Hexter never responded, and it is unclear whether Glinecke ever communicated the concerns of the employees to Hexter.
 
 
 11
 In early December 1984, the nine employees on the first shift decided to organize a union at Division 3. To this end, they contacted a representative of the Glass, Pottery, Plastic and Allied Workers of America and obtained and signed union authorization cards.
 
 
 12
 By December 27, the employees decided that they could not accept the working conditions any longer, and Bernhardt therefore placed the telephone call to Hexter. There is a dispute between the parties as to what, if anything, Hexter or other Lenape management personnel knew about the employees' dissatisfaction with the working conditions prior to the walkout. Even the petitioner Board does not contend, however, that Lenape knew that employee dissatisfaction had led to the beginnings of a unionization effort. At most, Hexter may have known, on December 27, 1984, that the employees were acting in concert when they threatened to leave their positions.
 
 
 13
 Following the walk-out of the nine employees, Hexter met with Helen Brown, President of Lenape to discuss the situation. They concluded that they had to "take a position that even if these people want to come back we cannot allow them back, otherwise we will have chaos with 117 employees, and people will be able to figure out that they can walk out anytime they want ..." Record at 358. Letters were sent to each of the employees advising them that they had forfeited their positions and would be replaced. Despite requests by the employees that they be permitted to return to their previous positions unconditionally, Lenape management remained firm in its position on the dismissals.[2]
 
 
 14
 In response to charges filed by Charles Bernhardt, Sr., the Regional Director issued a complaint and notice of hearing and scheduled a hearing for April 17, 1985. On April 17, 1985, the NLRB authorized the petitioner to petition the district court for injunctive relief pursuant to section 10(j) of the NLRA, 29 U.S.C. Sec. 160(j). Concluding that "[t]he evidence in the record, at least arguably, indicates that the employees were 'acting concertedly' " and therefore that there was reasonable cause to believe that a violation of the NLRA had occurred, the court nevertheless refused to grant injunctive relief on the grounds that the petitioner had not met the "just and proper" standard of section 10(j).
 
 II.
 
 15
 Arguing that an injunction order is necessary to restore and maintain the status quo pending a Board adjudication in order to preserve the Board's ability to issue a meaningful remedial order, petitioner Regional Director, on behalf of the NLRB, contends that the district court abused its discretion in denying the petition for injunctive relief. Injunctive relief, including interim reinstatement of the discharged employees, plaintiff contends, was just and proper under all of the circumstances. Respondent, on the other hand, contends that there is an ongoing activity that must be protected in the interim.
 
 
 16
 In declining to grant the injunctive relief requested, the district court relied upon the provision in section 10(j) which states that when it is in the public interest, a court may grant "such temporary relief or restraining order as it deems just and proper." In reviewing the district court's determination that injunctive relief was not appropriate, we are limited to deciding whether the lower court abused its discretion. Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 907 (3d Cir.1981). As we have previously noted, when applying the abuse of discretion standard, we should not disturb the district court's factual findings unless they are clearly erroneous. Moreover, we should not reverse the decision of the district court unless the undisturbed factual findings do not substantially relate to the conclusion reached. Kobell v. Suburban Lines, Inc., 731 F.2d 1076, 1092 (3d Cir.1984).
 
 
 17
 We are satisfied, after applying this standard of review, that the district court engaged in a careful analysis of the circumstances giving rise to the petition and properly took into account the policies underlying section 10(j). In fashioning this provision, Congress sought to ensure that the Board would be able to exercise effectively its ultimate remedial power. Therefore, section 10(j) was included to provide interim relief in a situation in which the Board and courts believe that it is necessary to preserve the effective exercise of such remedial power. Suburban Lines, 731 F.2d at 1091. See also S.Rep. No. 105, 80th cong., 1st Sess. 8, 27 (1947). Section 10(j), however, was never intended to become the normal method for resolving labor disputes. Suburban Lines, 731 F.2d at 1092.
 
 
 18
 As previously noted, the standard for granting a section 10(j) injunction requires, first, that the district court decide whether there is "reasonable cause" to grant the injunction. This prong of the test is satisfied when, viewing the facts most favorably to the Board, there is sufficient evidence to support the legal theory of violation presented by the Regional Director, and when that theory is substantial and not frivolous. Second, having found "reasonable cause," the district court must find that the issuance of an injunction is "just and proper," i.e., that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board. See Eisenberg v. Wellington Hall Nursing Home, 651 F.2d 902, 906-07 (3d Cir.1981); Eisenberg v. Hartz Mountain Corporation, 519 F.2d 138 (3d Cir.1975).
 
 
 19
 The district court was keenly aware both of its limited role in determining whether injunctive relief was appropriate and of the standards it was to apply in determining whether the "reasonable cause" and "just and proper" elements were satisfied.
 
 
 20
 The district court found that the petitioner had satisfied the "reasonableness" prong of the standard, but had not satisfied the "just and proper" requirement. Thus, it specifically concluded that the basic remedial function of the Board would not be frustrated by the denial of the injunction. In reaching this conclusion, the court found that there was no evidence that union activity would be "chilled" or that respondent had evidenced any anti-union animus.[3] The court further found that the size and intimacy of the group of the employees who walked out was such that if the Board ultimately orders reinstatement, its organizational efforts could be resumed.
 
 
 21
 In appealing from the district court's denial of injunctive relief, petitioner contends that the district court, in finding that the "just and proper" standard was not satisfied, failed to examine the effect of the discharges on the remaining employees, and in particular, failed to find that the discharges would have the effect of discouraging other employees from walking out to seek redress for their grievances.
 
 
 22
 It is well established that section 7 of the NLRA, 29 U.S.C. Sec. 157, protects employees from discharge if they peacefully leave their jobs to protest working conditions, even if the employees have not engaged in any union activity and do not make a specific demand in advance upon their employer to the condition they find objectionable.[4] NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345 (3d Cir.1969), cert. denied 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). For instance in Wilson, we held that employees who presented to their employer grievances arising from the employer's decision not to contribute to the profit-sharing plan were engaged in concerted activity sufficient to warrant protection from discharge.
 
 
 23
 Petitioner contends that because section 7 guarantees employees the right to seek redress of their grievances through concerted activity without union involvement, injunctive relief, including interim reinstatement, in this case was just and proper to ensure that the remaining employees would not be intimidated and discouraged from exercising their right to engage in concerted activity; the group's right to exercise their section 7 rights must be protected in its formative stages. In support of this contention, petitioner points to the fact that Hexter, the Chief Executive Officer, immediately after the walk-out, agreed with the President of Lenape that the discharged employees would not be reinstated because their actions could not be condoned or the remaining employees would also stage a walk-out whenever they wanted. Respondent's actions, petitioner contends, were, therefore, directly intended to have the effect of destroying "the bud of employee initiative aimed at bettering terms of employment and working conditions." Hugh H. Wilson Co. v. NLRB, 414 F.2d at 1347.
 
 
 24
 When filing a petition for injunctive relief pursuant to section 10(j), the Board acts not in the interests of the individual employees affected by the employer's actions but rather in the public's interest as embodied in the National Labor Relations Act. In Eisenberg v. Wellington Hall Nursing Home, 651 F.2d 902, 907 (3d Cir.1981), we concluded that interim reinstatement of the discharged employees was just and proper to maintain the integrity of the collective bargaining process. If the employees, who were all union supported, were not reinstated pending a final Board adjudication, the bargaining representative's ability to represent other members of the bargaining unit would be undermined, adversely affecting employee interest in unionization. In Suburban Lines, we found that reinstatement of discharged employees was not necessary to preserve the collective bargaining process because the employees constituted a small, intimate unit which would be able to reconstruct itself if the Board ultimately ordered reinstatement.
 
 
 25
 The district court here addressed the employees' protected right to engage in concerted activity explicitly in connection with its discussion of the reasonable cause standard. The court also concluded that there was insufficient evidence to demonstrate that the employer's conduct would "chill" union activity. Consistent with that conclusion is the conclusion that there is insufficient evidence that there will be a "chill" of basic section 7 rights to engage in concerted activity for mutual aid and protection. See District Court opinion at 13.
 
 
 26
 In this case, we agree with the district court's conclusion that injunctive relief is not necessary to prevent harm to the employees' right to engage in concerted activity pending any delayed final relief. If the Board ultimately orders reinstatement, the individual employees will be able to return to their previous positions in the day shift at Division 3 and recommence their organization activities as well as any concerted activities contesting their working conditions. The district court's finding that the size and intimacy of this group, like the group in Suburban Lines, will enable them to start up where they left off is not clearly erroneous.
 
 
 27
 More important to our present analysis however, is the fact that there is no evidence in the record to establish that other employees will be discouraged from engaging in concerted activity in the interim. There is no evidence that management was aware of the employees' embryonic efforts to unionize their division, nor does the Board even contend that they were. This court has recently reiterated that the illicit intent of the employer is a necessary element of a section 8(a)(1) violation, and that knowledge of employee activity is necessary for such intent to exist. Tri-State Truck Service, Inc. v. NLRB, 616 F.2d 65, 69 (3d Cir.1980). Brown and Hexter clearly had knowledge, at the time they dismissed the employees if not at the time the employees walked out, that concerted activity was involved. But it is equally clear that Brown and Hexter did not know anything of the unionization drive in Division 3. Absent such knowledge, it cannot be said that this case is about "employer retaliation [intended to] destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." Hugh H. Wilson Corporation v. NLRB, 414 F.2d 1345, 1347 (3d Cir.1969), cert. denied, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). For this reason, the public interest in safeguarding the collective bargaining process, both in its formative stages and subsequently, is not at stake here.
 
 
 28
 At least one, if not two, of the other divisions are presently unionized (divisions four and one). Moreover, despite Hexter's comments, the discharges were an isolated event in response to a particular action by the employees. Finally, we cannot agree with petitioner's contention that ultimate reinstatement would not eliminate any intimidation of present employees.
 
 
 29
 In considering a section 10(j) injunction petition, a district court must determine, on a case by case basis, what judicial action will be in the public interest and whether it is "just and proper" given the public interest, that an injunction issue pending the NLRB's resolution of the underlying unfair labor practice. Because the district court's factual findings in this case are not clearly erroneous and substantially relate to the conclusion that injunctive relief was not just and proper in this instance, we conclude that the district court did not abuse its discretion in denying the requested injunctive relief. The judgment of the district court will be affirmed.
 
 
 30
 BECKER, Circuit Judge, dissenting.
 
 
 31
 The district court held that injunctive relief is not necessary to prevent harm to the employees' right to engage in concerted activity pending delayed final relief, reasoning that the size and intimacy of the discharged group suggests that the employees will be able to pick up where they left off upon eventual reinstatement. I do not believe that the record supports this position, or that it supports the district court's alternative ground of decision--that Lenape's actions were not sufficiently egregious to justify equitable relief. Additionally, I disagree with the majority's view that Hexter's lack of awareness of a unionizing effort mitigates the need for injunctive relief.
 
 
 32
 Because I believe that the district court's conclusion that it was not "just and proper" to grant the relief requested by the Board is an abuse of discretion, I respectfully dissent.[1]
 
 I.
 
 33
 The majority has accepted the district court's finding that the discharged employees could readily resume concerted activity upon an eventual reinstatement. I believe this factual finding to be clearly erroneous.
 
 
 34
 The average grievance concerning an unfair labor practice apparently takes the NLRB 15 months to adjudicate. Kobell v. Suburban Lines, 731 F.2d 1076, 1094 n. 32 (3d Cir.1984).[2] On the record before us, it is unlikely that the discharged employees would resume their concerted activity if they were not reinstated for over a year. Indeed, almost immediately after their discharge, the employees wrote management requesting reinstatement "unconditionally." It appears that the discharged employees were so intimidated that they were willing to drop their grievances if they could have their positions back.
 
 
 35
 The district court found that because the discharged employees are a small and intimate unit, they are likely to resume concerted activity upon eventual reinstatement. But the notion of a small and intimate group, culled from Suburban Lines, should not be invoked as a talisman that renders section 10(j) relief unnecessary. In Suburban Lines, the discharged employees had been members of a union for twelve years and had successfully bargained with management. It was a reasonable inference that such a long-standing and experienced group would, upon eventual reinstatement, be willing to resume their concerted activity. That inference does not apply in a case where an inchoate group is discharged upon its first collective action. Indeed, even in Suburban Lines we were reluctant to draw the inference that the discharged employees would reconstitute themselves as a group upon an eventual Board order of reinstatement, and did so only because there was no evidence to the contrary. I therefore believe that an injunction is necessary to preserve the Board's remedial powers in the face of what appears to be a serious section (8)(a)(1) violation.
 
 II.
 
 36
 In an effort to buttress its conclusion that the district court did not abuse its discretion in denying injunctive relief, the majority intimates that Lenape, because it lacked awareness of the unionization drive in Division 3, was not guilty of a section 8(a)(1) violation. Maj. Op. at 1005. I do not understand this argument. Section 8(a)(1) prohibits an employer from interfering with the exercise of Section 7 rights, which include concerted activities for mutual aid and protection. It seems clear to me that, contrary to the majority's assertion, Lenape's actions constituted "employer retaliation intended to destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." Hugh H. Wilson Corporation v. NLRB, 414 F.2d 1345, 1347 (3d Cir.1969), cert. denied, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). The majority concedes that Hexter was aware that concerted activity was occurring. I see no reason why his lack of awareness that this concerted activity included a unionization drive alters the conclusion that a section 8(a)(1) violation took place. Nor do I understand the majority's view that because Hexter was unaware of the unionizing effort, "the public interest in safeguarding the collective bargaining process, both in its formative stages and subsequently, is not at stake here." Maj. Op. at 1005. The public interest in protecting concerted activity for mutual aid and protection, see supra note 1, especially in its formative stages, is at stake here--regardless of whether Hexter knew that a unionization drive had commenced.[3]
 
 III.
 
 37
 The district court also found, as an alternative or supplemental ground for its decision, that Lenape's actions were not sufficiently egregious to justify the award of equitable relief. I agree with the district court that "some measure of equitable principles comes into play" in determining whether to grant section 10(j) relief. Boire v. Pilot Freight Carriers, 515 F.2d 1185, 1192-93 (5th Cir.1975). However, I disagree with the district court's assessment that Lenape's actions were not egregious. Upon the very first concerted activity of the Division 3 employees, activity which by all appearances is protected by law, Lenape reacted with the most severe sanction available to it--the immediate discharge of the employees. I do not condone the tactics of the employees in this case, nor do I deny that some sanction may have been appropriate. But Hexter apparently made no effort to learn about the conditions that led the employees to walk out; rather, as noted, he precipitously discharged the employees and subsequently refused their request to return to work. Indeed, Hexter conceded that his motivation for refusing their offer to return was the desire to discourage similar activity in the other divisions--activity that is also legally protected.
 
 
 38
 In my view, Lenape's conduct was plainly egregious. Thus equitable considerations incontrovertibly weigh in favor of granting section 10(j) relief. See Kaynard v. MMIC, Inc., 734 F.2d 950 (2nd Cir.1984) (egregiousness of employer's conduct is a factor in determination of whether section 10(j) relief is appropriate).
 
 IV.
 
 39
 For the reasons stated above, I believe that the law of this circuit and the purposes underlying section 10(j) command the conclusion that interim reinstatement is "just and proper" in this case. I believe the district court's conclusion to the contrary was based on clearly erroneous findings of fact, and constituted an abuse of discretion. Therefore, I respectfully dissent.
 
 
 
 *
 Honorable Daniel H. Huyett, 3rd, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Section 10(j) of the NLRA, 29 U.S.C. Sec. 160(j) provides in pertinent part:
 Injunctions
 (j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 
 
 [2]
 At oral argument we asked counsel for petitioner to address in written form the reinstatement offer made by respondent and what effect, if any, that offer had on the need for injunctive relief. In response to this request, we received from counsel a letter dated October 31, 1985. As outlined in that letter, the reinstatement offer made by respondent was in response to the district court's efforts to achieve an informal settlement of the case. The reinstatement offer was extended to those employees who were unemployed at the time of the hearing. These employees would be reinstated to any available vacancies which existed at that time or which might arise later at any of the respondent's four divisions and for which the discharged employees were eligible. After review of the letter, we agreed with the Board's position that because the reinstatement offer was extended only to those employees who remained unemployed and was good only for positions which might be available and not for the positions from which the employees were discharged, it is not relevant to our present inquiry and does not address the concerns raised by the Board's petition
 
 
 [3]
 Petitioner contends that the district court did not permit it adequate opportunity to develop the record as to the issue of the potential "chill" to union activity caused by respondent's actions. In response, Lenape notes that the district court precluded petitioner from introducing evidence as to the organizational drive at the hearing because respondent had never been charged with interfering with union activity. Moreover, petitioner had specifically requested that the district court rely upon the administrative proceeding as the record before it. We find that the district court's actions were justified
 
 
 [4]
 Section 7 of the NLRA, 29 U.S.C. Sec. 157, provides in pertinent part:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 
 
 [1]
 The major cases in this circuit involving section 10(j) relief have involved an ongoing collective bargaining process, see Kobell v. Suburban Lines, 731 F.2d 1076, 1092 (3d Cir.1984); Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902 (3d Cir.1981); and Lenape suggests that section 10(j) relief should be limited to such situations. The majority apparently rejects this proposition since it does not dispose of the case on this basis (though it does assert at one point that "the public interest in safeguarding the collective bargaining process ... is not at stake here." Maj. Op. at 1005.) Because the majority's implicit holding on this point is significant, it is useful to amplify it
 In Wellington Hall, we held that the fact that the discharged employees could eventually be reinstated and given backpay did not render section 10(j) relief unnecessary. Rather, we held, section 10(j) relief was needed to prevent damage to a collective bargaining process. Lenape's suggestion that this holding is limited to cases involving a collective bargaining process is founded on neither logic nor policy.
 The rationale underlying Wellington Hall was that the public interest in employees' capacity to take collective action to improve their position would be defeated if improperly discharged employees were not reinstated during the lengthy period it takes the NLRB to adjudicate unfair labor practice claims. The discharged Lenape employees had embarked upon a campaign of concerted activity to improve their workplace conditions. From the standpoint of the public interest, it is as important that protection be given to this kind of activity as to a formal collective bargaining process. Indeed, it may be more important since, in the instant case, efforts to unionize were nipped in the bud by the employees' discharge. See Maram v. Universidad Intraamericana De Puerto Rico Inc., 722 F.2d 953 (1st Cir.1983) (section 10(j) relief appropriate where employees in early stages of unionizing campaign were discharged).
 
 
 [2]
 It is possible, of course, that this time period has changed since our recent decision in Suburban Lines, but it is unlikely that it has changed substantially
 
 
 [3]
 I note, too, my uneasiness about the district court's dismissal of the likely chilling effect upon the employees at the other Lenape divisions. In Wellington Hall, we observed that the "discharge of active and open union supporters ... risks a serious adverse impact on employee interest in unionization." 651 F.2d at 907, quoting Kaynard v. Palby Lingerie Inc., 625 F.2d 1047, 1053 (2d Cir.1980). Here, especially in light of Hexter's expressed intent to discourage other concerted activity, see Maj. Op. at 1002, the inference seems as strong as in Wellington Hall that employees other than those discharged will be discouraged from concerted activity unless interim relief is granted