**SANDOZ PHARMACEUTICALS CORPORATION, Appellant,**

v.

**RICHARDSON–VICKS, INC., Appellee.**

No. 89–3654.

United States Court of Appeals, Third Circuit.

Argued Jan. 17, 1990.

Decided April 24, 1990.

John W. Nields, Jr. (argued), Kathleen H. McGuan, Howrey & Simon, Washington, D.C., Thomas Herlihy, III, Herlihy, Harker & Kavanaugh, Wilmington, Del., Anne S. Davidson, Michael McGrane, Sandoz Pharmaceuticals Corp., East Hanover, N.J., for appellant.

Harold P. Weinberger (argued), Jonathan M. Wagner, Samuel Friedman, Kramer, Levin, Nessen, Kamin & Frankel, New York City, Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Robert N. Anderson, Richardson–Vicks, Inc., Shelton, Conn., for appellee.

Before BECKER, GREENBERG and NYGAARD, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal, from an order of the district court denying plaintiff/appellant Sandoz Pharmaceuticals Corp.'s request for a preliminary injunction against defendant/appellee Richardson–Vicks, Inc., is another installment in the cough syrup marketing wars. Sandoz alleges that Vicks's representations about its product, Vicks Pediatric Formula 44 ("Pediatric 44"), constituted false and deceptive advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988).

At the nub of the controversy is Vicks's assertion that Pediatric 44 starts to work the instant it is swallowed. Sandoz alleges that the representations about the instant action of the product are false. It also alleges that such representations constitute *per se* violations of the Lanham Act, given

Vicks's failure to disclose, on Pediatric 44's label, that the demulcents which theoretically effectuate the immediate relief are intended to be active [1] yet are not approved by the Food and Drug Administration ("FDA").[2] Additionally, Sandoz challenges Vicks's advertising claims that Pediatric 44 is superior to its competitors.

After an extensive hearing, the district court found that Sandoz: (1) had failed to meet its burden of proving that any of Vicks's advertising claims was false or deceptive, and (2) had not proved irreparable injury. Upon review, we are satisfied that the district court's findings of fact are not clearly erroneous and that it did not abuse its discretion or commit an error of law in refusing to enjoin Vicks's advertising. Hence, we affirm.

Our conclusions depend on the resolution of an interesting legal issue arising out of the interface between the Lanham Act and the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–92 (1982). The controversy centers on whether a Lanham Act plaintiff needs to show only that the defendant's advertising claims of its own drug's effectiveness are inadequately substantiated under FDA guidelines, or whether the plaintiff must also show that the claims are literally false or are misleading to the public. For the reasons that follow, we conclude that the additional proof that a defendant's claims are literally false or actually misleading is necessary to sustain a Lanham Act claim.

## I. FACTS AND PROCEDURAL HISTORY

Sandoz manufactures and sells various pharmaceutical products. Its offerings include Triaminic–DM and Triaminicol, leading cough medicines which may be used by children as well as adults. Like Sandoz, Vicks produces and markets a wide array of pharmaceuticals, but, unlike Sandoz, it has not had a market leader in the over-the-counter (OTC) children's cough medicine market. In the fall of 1989, Vicks sought to develop such a leader by introducing a new product, Pediatric 44.

Before its nationwide release of Pediatric 44, Vicks developed a consumer advertising campaign which claimed that Pediatric 44 "starts to work the instant they [the children] swallow" by "shielding irritated cough receptors on contact." Vicks planned to carry this message to consumers via television commercials and print advertisements in consumer magazines, and to pediatricians via "information sheets" mailed to doctors. In addition to claiming that Pediatric 44 "starts working from the very first swallow," the information sheets also state that "Pediatric FORMULA 44 provides more cough relief in the first thirty minutes [than] those thin, watery cough medicines." To support this statement, the Vicks circular used a bar graph which compared Pediatric 44 with "the leading OTC cough syrup," and showed Pediatric 44 apparently outperforming the competitor.

Vicks's advertising claims with regard to Pediatric 44 are based on the effect of certain locally-acting, inert sugary liquids known as "demulcents," which operate directly on cough receptors in the recipient's throat and respiratory passages. Demulcents are topically acting antitussives, in contrast to centrally acting antitussives, which are the traditional cough antidotes.[3]

---

1. Demulcents have not been classified as inactive or active by the Food and Drug Administration, see 21 C.F.R. § 341.14 (1988) (not including demulcents in an approved list of antitussives); 41 Fed.Reg. 38,354 (1976) (panel report listing demulcents in FDA category III, which covers ingredients for which "the available data are insufficient to classify" the ingredient, 21 C.F.R. § 330.10(a)(5)(iii) (1988)), but Sandoz argues that they are clearly active ingredients insofar as Vicks claims that they make its product effective.

2. Vicks's own testing would not be sufficient for approval of a new drug application under FDA regulations.

3. Centrally acting antitussives and topically acting antitussives are the two categories of cough suppressants. Centrally acting antitussives depress the cough center of the central nervous system. They must be absorbed into the blood stream, which normally takes approximately thirty minutes, before they become effective. On the other hand, topically acting antitussives, such as demulcents, coat the cough receptors in

Because these demulcents work on contact, Vicks claims that Pediatric 44 begins to reduce coughs as soon as it is swallowed.[4]

Vicks performed various tests to support this conclusion. The record contains test results which support, if only marginally, Vicks's arguments that Pediatric 44 starts to work right away, that there is a scientific basis for this claim, and that Pediatrics 44 is superior to its competitors. However, the FDA has never approved any "demulcents" as effective for the relief of coughs, see supra note 1, and whether Vicks's level of testing could meet the high standards for drug approval set by the FDA is far from certain.[5]

On September 22, 1989, the district court filed an opinion and order denying Sandoz's motion for preliminary injunction. The court first found that Vicks's consumer advertising claims were not literally false, because Vicks's test results indicated that the demulcents in Pediatric 44 could begin to work immediately. In addition, the court found no evidence to support Sandoz's contentions that Vicks's consumer advertising claims were misleading, because Sandoz had failed to advance any substantial proof indicating that the advertising was deceptive. The court further concluded that advertising claims are not per se misleading if inadequately substantiated under FDA guidelines.

Without addressing the claim directly, the district court apparently rejected Sandoz's contention that it is misleading for a manufacturer to promote a certain ingredient in its cough medicine as "start[ing] to work the instant" it is swallowed, yet list this ingredient as inactive on the medicine's label. The issue was extensively briefed and argued, but the court found that Sandoz never advanced any evidence that consumers were misled by any aspect of Vicks's campaign.

The court also found that Vicks's claims on its information sheets, including the claim that Vicks starts to work "from the first swallow," while thin syrups start to work "within the first 30 minutes", were not literally false and that Sandoz had failed to prove that these sheets were misleading to the pediatricians who received them. There was no evidence that trained pediatricians would interpret the graph contained in these sheets as implying that Pediatric 44 was clearly superior to competing brands.

Finally, the court held that Sandoz was unable to prove irreparable harm in view of the lack of proof of how consumers or pediatricians would be affected by Vicks's advertising. The court concluded that the record did not support the determination that, as a result of Vicks's advertising, Sandoz would lose part of its customer base, stating that no consumer surveys had

the membranes lining the throat and respiratory passages, thus immediately shielding these receptors from external cough stimuli.

**4.** Other cough medicines also contain demulcents, and Vicks has suggested that its competitors may be able to make "first swallow" claims as well—an invitation that Sandoz has declined.

**5.** The FDA has expressed the opinion that it "does not consider induced cough studies [such as citric acid aerosol tests] alone as adequate to demonstrate the antitussive effectiveness of an ingredient." 54 Fed.Reg. 8494, 8498 (Feb. 28, 1989) (to be codified at 21 C.F.R. § 341) (emphasis added). However, it has not explained what other forms of verification, if accompanying positive induced cough studies, would be sufficient to obtain FDA approval.

To this point, Vicks has only completed induced cough studies on Pediatric 44. These tests employed healthy subjects whose coughs were artificially induced by the inhalation of citric acid aerosol. Of the five tests performed, each test showed a statistically significant reduction in coughs by the subjects after they received Pediatric 44 as compared to before they received any cough medicine. All but one of the tests, however, were statistically inconclusive regarding whether Pediatric 44 reduced coughs more effectively than Robitussin, a leading OTC children's cough medicine. At the preliminary injunction hearing, the parties produced a good deal of expert testimony regarding the accuracy of these results, with Vicks supporting and Sandoz attacking the tests employed.

We note that Vicks undertook, but eventually abandoned, two attempts to measure the effectiveness of Pediatric 44 utilizing "disease state" studies, i.e., studies using individuals actually suffering from upper respiratory infections or other cough-inducing illnesses. Disease state studies are considered more accurate measures of a drug's effectiveness because the drug is tested on subjects actually suffering from the symptoms the drug allegedly combats.

been presented demonstrating a causal link between Vicks's advertising and Sandoz's sales. The court took special note of the evidence showing that, despite Vicks's test advertising in Pittsburgh, Sandoz's sales of Triaminic in that city increased the same 27% as was reflected in national figures.

We review the district court's conclusions of law in plenary fashion, *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 852 (3d Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986), its factual findings under a clearly erroneous standard, *Eisenberg ex rel. NLRB v. Lenape Prods., Inc.*, 781 F.2d 999, 1003 (3d Cir.1986), and its decision to deny the injunction on an abuse of discretion standard, *id.* Because our scope of review of fact findings is so narrow, and, as noted above and explained below, the record supports the district court's findings of fact, we will not elaborate on the intricacies of the record. Rather, we will devote the bulk of our time to discussing the legal issues.

## II. STATUTORY BACKGROUND

Three different federal statutory schemes regulate OTC drug marketing, but the interplay among the regulations is somewhat ambiguous. The primary regulatory system covering prescription and non-prescription drugs was created by the Food, Drug and Cosmetic Act (the "FD & C Act"). 21 U.S.C. §§ 301–92 (1982). Under the FD & C Act, a "new" drug may not be marketed and sold in the United States without prior approval by the FDA. *See id.* at §§ 331(d), 355(a). To obtain this approval, an applicant must demonstrate, by the presentation of substantial evidence, that the drug is safe and effective for the uses recommended in its labeling. *See id.* at § 355.

The approval process usually consists of three stages of review. First, the FDA appoints an advisory review panel of independent qualified experts. This panel submits a recommendation to the FDA stating whether a drug is or is not safe and effective for its designated purposes or whether there is insufficient evidence upon which to base a recommendation. Second, the FDA publishes a tentative "final monograph" presenting its initial position on the drug's safety and effectiveness. Third, after an extensive comment and review period, the FDA publishes a final monograph that establishes the conditions under which a drug is considered safe and effective. *See* 21 C.F.R. § 330.10 (1988). Once a final monograph goes into effect, it is illegal to sell a drug described therein unless it conforms therewith.[6]

Public regulation of trade competition beyond antitrust violations is vested by the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. §§ 41–58 (1988), in the Federal Trade Commission (the "FTC"). The FTC Act prohibits "unfair methods of competition," including advertisements containing false or misleading representations or material omissions. *See* 15 U.S.C. §§ 45, 52(a), 55(a)(1) (1988) (codifying FTC Act §§ 5, 12, 15). The Supreme Court and other federal courts have given an expansive reading to both the scope of the FTC Act and the powers granted to the FTC thereunder. *See F.T.C. v. Colgate–Palmolive Co.*, 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); *American Home Prods. Corp. v. F.T.C.*, 695 F.2d 681 (3d Cir.1982). This expansive view of the FTC's capacity to define and regulate unfair trade practices is premised upon the FTC's "familiarity with the expectations and beliefs of the public, acquired by long experience." *American Home Prods.*, 695 F.2d at 686.

To a certain degree, the jurisdictions of the FDA and the FTC overlap in the regulation of OTC drug marketing. The FDA's authority in this field derives from the requirement that no drug may be sold in the United States unless it has FDA approval, and then only within the standards set by the FDA. The FTC's authority derives

---

6. If a drug is marketed without prior FDA approval or without complying with a controlling final monograph, the United States may bring an enforcement action under the FD & C Act. Enforcement measures include seizure of the drug product, civil injunction against its sale, and criminal penalties against the violator. *See* 21 U.S.C. §§ 332–34 (1982).

from its power to regulate any false or deceptive advertising or unfair trade practices, even in the OTC drug industry. To resolve issues of enforcement resulting from this concurrent jurisdiction, in 1971 the FDA and the FTC agreed to a division of regulatory authority: the FDA regulates the labeling of OTC drugs while the FTC monitors the advertising for these drugs. *See* FDA/FTC Memorandum of Understanding, 36 Fed.Reg. 18,539 (1971).

The third relevant statute in the field of OTC drug marketing is the statute at issue in this case, the Lanham Act. The Lanham Act creates a civil remedy for the use of a "false or misleading description of fact, or false or misleading representation of fact" in connection with the sale of goods in interstate commerce. Trademark Law Revision Act, Pub.L. No. 100–667, § 132, 102 Stat. 3946 (1988) (codified as amending 15 U.S.C. § 1125(a)). As the court noted in *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.*, 747 F.2d 114 (2d Cir.1984):

> After initial uncertainty as to the statute's reach, with some believing it to be little more than a codification of the common law action for deceitful advertising, it is now settled that it creates a new statutory tort of broader scope, which requires neither proof of literal or obvious falsehood, nor of intent to deceive. As we stated in *Vidal Sassoon*, "§ 43(a) of the Lanham Act encompasses more than blatant falsehoods. It embraces 'innuendo, indirect intimations, and ambiguous suggestions' evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement."

*Id.* at 118–19 (citations omitted) (quoting *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 277 (2d Cir.1981)). Moreover, the Lanham Act, unlike the FD & C Act and the FTC Act, expressly establishes a private remedy for any violation thereunder. *See* 15 U.S.C. § 1125(a).

### III. THE FALSE ADVERTISING CLAIMS

#### A. *Inadequate Substantiation and the Lanham Act*

The first question of law we must address is whether a plaintiff can prevail under the Lanham Act by showing simply that the defendant's advertising claims about its OTC drug's effectiveness are inadequately substantiated under federal guidelines, without also showing that the claims are literally false or are misleading to the consuming public. Sandoz's prime contention on appeal is that it can.

■ The FTC has the authority under Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45 & 52, to find that an inadequately substantiated advertising claim regarding a non-prescription drug is deceptive or misleading, and thus illegal. *See American Home Prods.*, 695 F.2d at 697; *see also Bristol–Myers Co. v. F.T.C.*, 738 F.2d 554, 562 (2d Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 960, 83 L.Ed.2d 966 (1985). Sandoz argues that the language in the FTC Act prohibiting "any false advertising," 15 U.S.C. § 52(a), is functionally indistinguishable from the language in the Lanham Act prohibiting "any false description or representation." 15 U.S.C. § 1125(a). Therefore, according to Sandoz, "it would be absurd" to conclude that an inadequately substantiated claim can violate Sections 5 and 12 of the FTC Act but not Section 43(a) of the Lanham Act.

Vicks, on the other hand, states that Sandoz cannot succeed merely by showing that Vicks's advertising claims are not supported by enough evidence to warrant FDA approval. Rather, Vicks maintains that Sandoz must prove that insufficient substantiation misleads consumers or pediatricians. Vicks claims that it is "well settled" that "[t]o prevail on a claim of unfair advertising under Section 43(a), a plaintiff must first prove by a preponderance of the evidence that the claims it challenges are false or deceptive." *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 251 (D.Del.1980). Hence, the argument continues, because Sandoz advanced no evidence of target audience confusion regarding Vicks's promotional campaign, it has not met its burden of proving deception.

The only court of appeals to have faced this question reached the conclusion advocated by Vicks. The Second Circuit, which

had previously ruled that the FTC could find a violation of Sections 5 and 12 based upon the inadequate substantiation of a defendant's advertising claim regarding an OTC drug, *Bristol–Myers Co.*, 738 F.2d at 562, held that a Lanham Act plaintiff

> bears the burden of showing that a challenged advertisement is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof.

*Procter & Gamble Co.*, 747 F.2d at 119 (citations omitted). We agree with the holdings of the Second Circuit in *Procter & Gamble* and of Judge Stapleton, then sitting on the district court, in *Toro, supra.* These decisions are not only well-reasoned, they are consistent with this court's long-established construction of the Lanham Act in general. *See Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir.1958) (noting that the plaintiff bears the burden of persuasion in Lanham Act cases).[7]

The key distinctions between the FTC and a Lanham Act plaintiff turns on the burdens of proof and the deference accorded these respective litigants. The FTC, as a plaintiff, can rely on its own determination of deceptiveness. In contrast, a Lanham Act plaintiff must prove deceptiveness in court. As the Supreme Court has stated:

> [A]s an administrative agency which deals continually with cases in the area, the [FTC] is often in a better position than are courts to determine when a practice is "deceptive" within the meaning of the Act. This Court has frequently stated that the [FTC's] judgment is to

be given great weight by reviewing courts. This admonition is especially true with respect to allegedly deceptive advertising since the finding of a § 5 violation in this field rests so heavily on inference and pragmatic judgment.

*Colgate–Palmolive Co.*, 380 U.S. at 385, 85 S.Ct. at 1042–43 (footnote omitted); *see also* Diver, *Statutory Interpretation in the Administrative State*, 133 U.Pa.L.Rev. 549, 593 (1985) ("[C]ourts should presumptively defer to an agency's interpretation of a statute under which the agency exercises significant policymaking responsibility.").

Accordingly, consumer testimony proving actual deception is not necessary when the FTC claims that an advertisement has the capacity to deceive or mislead the public. *See American Home Prods.*, 695 F.2d at 687–88 n. 10; *see also Simeon Mgmt. Corp. v. F.T.C.*, 579 F.2d 1137, 1146 n. 11 (9th Cir.1978). Concomitantly, in cases brought by the FTC under Section 5, "[a]dvertising capable of being interpreted in a misleading way should be construed against the advertiser." *Resort Car Rental System, Inc. v. F.T.C.*, 518 F.2d 962, 964 (9th Cir.), *cert. denied sub nom. MacKenzie v. United States*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), *quoted with approval in American Home Prods.*, 695 F.2d at 687 n. 9.[8] A Lanham Act plaintiff, on the other hand, is not entitled to the luxury of deference to its judgment. Consequently, where the advertisements are not literally false, *see PPX Enterprises v. Audio Fidelity Enterprises*, 818 F.2d 266, 272 (2d Cir.1987), plaintiff bears the burden

---

**7.** This case does not require us to address the question whether *completely unsubstantiated* advertising claims violate the Lanham Act absent proof that consumers are actually misled by this lack of substantiation. *See Upjohn Co. v. Riahom Corp.*, 641 F.Supp. 1209, 1223 (D.Del.1986). In such a case, there is a plausible argument that the claim is literally false because the advertiser has absolutely no grounds for believing that its claim is true. A Lanham Act plaintiff may be permitted to presume that consumers expect advertisers to have at least some semblance of support for their publicly-disseminated claims. However, since that is not the question before us, we do not decide whether a completely unsubstantiated claim is *per se* false or whether a Lanham Act plaintiff can presume

that a defendant must have some substantiation for its advertising claims.

**8.** The FTC is not required to prosecute every potential false advertising claim it identifies or assert an inadequate substantiation argument in every prosecution it undertakes. Instead, in the exercise of its discretion, it can seek to enjoin advertisements as inadequately substantiated only in those cases where, in its judgment, such under-substantiation is misleading to those the FTC Act was intended to protect. *Cf.* Diver, *supra*, at 577 (noting that a statute's administering agency presumably has the sharpest "insight ... into the understanding of those affected [and protected] by the statute").

of proving actual deception by a preponderance of the evidence. Hence, it cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react.

Sandoz's invitation to blur the distinctions between the FTC and a Lanham Act plaintiff would require us to ignore the separate jurisprudence that has evolved under each Act, and the sound reasoning that underlies it. We decline the invitation. We hold that it is not sufficient for a Lanham Act plaintiff to show only that the defendant's advertising claims of its own drug's effectiveness are inadequately substantiated under FDA guidelines; the plaintiff must also show that the claims are literally false or misleading to the public.

### B. *Sufficiency of Evidence*

1. Consumer Advertisements

■ Sandoz takes issue with the district court's conclusion that it had failed to meet its burden of proof. The district court relied on the lack of a consumer survey, which is a common mode of proof in these cases. Sandoz submits that consumer surveys or some other surrogate for the FTC's expertise are needed only when an advertising claim is ambiguous, not when it is clear but inadequately substantiated. However, there is no legal support for Sandoz's theory.

The law does not presume that consumers assume that all OTC drug advertising claims are substantiated. Accordingly, a plaintiff must produce consumer surveys or some surrogate therefor to prove whether consumers expect an advertising claim to be substantiated and whether they expect the level of substantiation to be greater than that which the defendant has performed. The effect of the advertisement on the consumer is the critical determination, and it must be demonstrated by a Lanham Act plaintiff regardless of whether the claim is facially ambiguous.

As we stated earlier, the FTC's unique expertise and experience regarding consumer expectations allows it to determine for itself the level of substantiation consumers expect to support an advertising claim. If we were to hold that a Lanham Act plaintiff who has shown that a defendant's advertising claim was not supported by evidence sufficient to meet FDA testing regulations need not prove that consumers expect the claim to meet FDA testing requirements, then the Lanham Act plaintiff would stand in the same position as the FTC. Only the FTC is entitled to presume consumer expectations, however, because only the FTC has the necessary administrative experience and expertise.

As noted above, Sandoz failed to advance actual evidence of consumer misinterpretation. Furthermore, Sandoz's counsel in oral argument before this court admitted that Sandoz had not proven either that the ingredient in Pediatric 44 designed to shield cough receptors was ineffective or that Vicks's advertising claim was literally false. The district court carefully analyzed the evidence of Vicks's theoretical and empirical justifications for its advertising claims, and we cannot say that its finding that Sandoz did not establish that consumers were misled was clearly erroneous. The court had ample evidence before it, including the contents of Vicks's advertisements, the statements of multiple experts, and the results of various tests performed using Pediatric 44.

2. Vicks's Circulars To Physicians

■ Turning to the advertising targeted at the pediatricians, we note first that, as pointed out *supra* at 225, the district court found that Vicks's claims in the physicians circulars were not literally false; we cannot say that that finding was clearly erroneous. Thus, we turn to whether the claims to physicians were misleading. We note that "[c]ontext can often be important in discerning the message conveyed and this is particularly true where, as here, the target of the advertising is not the consuming public but a more well informed and sophisticated audience." *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.*, 532 F.Supp. 714, 717 (D.Del.1982). Hence, a target audience's special knowledge of a class of products is highly relevant to any claim that it was misled by an advertise-

ment for such a product. Sandoz never advanced any hard evidence that pediatricians would be misled by Vicks's information sheets or that they would believe that the assertions contained therein were supported by a greater degree of testing data than Vicks actually had compiled. We therefore conclude that the district court's finding that Sandoz had not proven that the pediatrician advertisements were misleading is also not clearly erroneous. Likewise, the court's finding that Vicks's claim that Pediatric 44 was superior to the "thin watery cough medicines" is sufficiently supported. While the evidence on this point is underwhelming, it is enough to get past the low threshold of review.

## IV. THE LABELING CLAIM

■ We turn now to the question whether a Lanham Act false labeling claim exists against a manufacturer who lists an ingredient as "inactive" when FDA standards seem to require that such an ingredient be labeled as "active." [9]

Sandoz has presented no evidence showing that Pediatric 44's "inactive" label is misleading to the consuming public, and Sandoz did not actively pursue the argument, either here or in the district court, that the "inactive" label in question was deceptive. Instead, it alleges that the label contains a literally false description of the product. In essence, Sandoz states that if Vicks claims that its demulcents enable Pediatric 44 to begin to work as soon as it is swallowed, then these demulcents are "active" ingredients within the meaning of 21 C.F.R. § 210.3(b)(7). Vicks responds that Sandoz's claim is no more than an allegation of a misbranding violation under the FD & C Act, and that, although Sandoz's allegation may create a cause of action for the FDA, as will be explained *infra*, the claim does not give rise to a cause of action for a private plaintiff under the Lanham Act.

The Lanham Act is primarily intended to protect commercial interests. *See Colli-*

gan v. Activities Club of New York, Ltd., 442 F.2d 686, 692 (2d Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). A competitor in a Lanham Act suit does not act as a " 'vicarious avenger' of the public's right to be protected against false advertising." *American Home Prods. Corp. v. Johnson & Johnson*, 672 F.Supp. 135, 145 (S.D.N.Y.1987). Instead, the statute provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising. The FD & C Act, in contrast, is not focused on the truth or falsity of advertising claims. It requires the FDA to protect the public interest by "pass[ing] on the safety and efficacy of all new drugs and ... promulgat[ing] regulations concerning the conditions under which various categories of OTC drugs ... are safe, effective and not misbranded." *American Home Prod. Corp. v. Johnson & Johnson*, 436 F.Supp. 785, 797–98 (S.D.N.Y.1977), *aff'd*, 577 F.2d 160 (2d Cir.1978).

Sandoz argues that false labeling is actionable under the Lanham Act, and rather conclusively assumes that Vicks's listing of the demulcents in its Pediatric 44 as "inactive" is false. Assuming *arguendo* that false labeling is actionable under the Lanham Act, Sandoz cannot prevail on its labeling claim because it has not proved that Vicks's labeling is false. Sandoz's counsel argued to the district court that "[i]f [the demulcents] relieve coughs they're active. That's true as a matter of common sense and normal English." App. at 175, *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, (D.Del.1989) (No. 89–3654). Such an interpretation of FDA regulations, absent direct guidance from the promulgating agency, is not as simple as Sandoz proposes.

The FDA has not found conclusively that demulcents must be labelled as active or inactive ingredients within the meaning of 21 C.F.R. § 210.3(b)(7). *See supra* note 1

---

**9.** An ingredient is considered "active" if it "is intended to furnish ... direct effect in the ...

mitigation [or] treatment ... of disease." 21 C.F.R. § 210.3(b)(7) (1988).

and accompanying text.[10]  We decline to find and do not believe that the district court had to find, either "as a matter of common sense" or "normal English," that which the FDA, with all of its scientific expertise, has yet to determine.  Because "agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969).  Thus, we are unable to conclude that Vicks's labeling of Pediatric 44's demulcents as inactive is literally false, even if Vicks concurrently claims that these ingredients enable its medicine to work the instant it is swallowed.

Sandoz's position would require us to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulations.  Jurisdiction for the regulation of OTC drug marketing is vested jointly and exhaustively in the FDA and the FTC, and is divided between them by agreement.  *See* FDA/FTC Memorandum of Understanding, 36 Fed.Reg. 18,539 (1971).  Neither of these agencies' constituent statutes creates an express or implied private right of action, *see, e.g., Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir.1974); *American Home Prods. Corp. v. Johnson & Johnson,*

436 F.Supp. at 797–98, and what the FD & C Act and the FTC Act do not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of these Acts or their accompanying regulations.  *Cf. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 651 (3d Cir.1954) (noting that the Lanham Act created a distinct and separate federal cause of action).

A Lanham Act plaintiff must prove, by a preponderance of the evidence, (1) that the defendant's promotions contained a material representation or description, and (2) that this material representation or description was false or verifiably misleading.  The cases cited by Sandoz do no more than confirm these standards and emphasize that an advertising claim is not shielded from the Lanham Act merely by appearing only on a product's label.[11]  They provide no support for the theory that it is appropriate for a court in a Lanham Act case to determine preemptively how a federal administrative agency will interpret and enforce its own regulations.  *See Cutler v. Kennedy*, 475 F.Supp. 838, 856–57 (D.D.C. 1979) (stating that it is not for a court to force the FDA to interpret, apply and enforce its regulations in a manner determined by the court to fairly effectuate the FD & C Act's policies).[12]

Accordingly, under the facts of this case, Sandoz cannot prevail on its claim that

---

10. Sandoz is free to petition the FDA to investigate these alleged labeling violations.  *See American Home Prods. Corp. v. Johnson & Johnson,* 672 F.Supp. at 145.  Sandoz represents that it has embarked upon this path already.  The fact that it has been unable to get a quick response from the FDA, however, does not create a claim for Sandoz under the Lanham Act.

11. In *PPX Enters., Inc. v. Audio Fidelity Enters.*, 818 F.2d 266 (2d Cir.1987), the district court found that a record label falsely purported the record to contain performances by Jimi Hendrix.  The Second Circuit held that this was actionable under the Lanham Act since "[a] record album's cover ... is one of the primary means of advertisement for a record album." *Id.* at 272.  The court was not concerned with whether the record label met federal regulatory standards.  Rather, it recognized that an important medium of advertising, a record's album cover, is not protected from the Lanham Act by the fact that it also can be described as a label.

*Potato Chip Inst. v. General Mills, Inc.*, 333 F.Supp. 173 (D.Neb.1971), *aff'd*, 461 F.2d 1088 (8th Cir.1972), also focused on the contents of a product's label as an advertisement to consumers.  The defendant labeled a product as "Potato Chips" without also prominently noting that these chips were made from dried potato granules, not raw potatoes.  There was strong proof presented to the district court that the phrase "potato chip" advertised to consumers that the chip was made from raw potatoes.  *See id.* at 179–81.  Hence, the unqualified package advertisement of the defendant's product as "potato chips" was held to be materially misleading advertising.

12. *Cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (noting the policy "to protect ... agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way").

Pediatric 44's label violates the Lanham Act. Sandoz made no showing to the district court that this label was misleading to consumers or that it contained any false statement aside from the allegedly inaccurate "inactive" labeling of the demulcents. As we have explained, the issue of whether an ingredient is properly labeled "active" or "inactive" under FDA standards is not properly decided as an original matter by a district court in a Lanham Act case. Therefore, the district court did not err in refusing to accept this theory as grounds for proving success on the merits in this law suit.

## V. CONCLUSION

For the foregoing reasons, the district court's findings of fact are not clearly erroneous, and it was correct in rejecting Sandoz's legal claims. It is clear, therefore, that the district court did not abuse its discretion in finding that Sandoz could not prove a likelihood of success on the merits. The judgment of the district court will be affirmed.[13]

---

**13.** In view of this result, it is unnecessary for us to reach the question whether Sandoz had shown irreparable harm in engaging in a balancing of the equities in accordance with preliminary injunction jurisprudence. *See Hohe v.* *Casey* 868 F.2d 69, 72 (3d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989); *Lorentangeli v. Critelli,* 853 F.2d 186, 196 (3d Cir.1988).